**Russell RIVES, d/b/a Beech Street Auto Salvage, Plaintiff-Appellant,**

v.

**CITY OF CLARKSVILLE, Tennessee, Defendant-Appellee.**

Court of Appeals of Tennessee, Middle Section.

April 23, 1981.

Certiorari Denied by Supreme Court July 6, 1981.

Charles A. Leach, Elizabeth L. Miller, Harris & Leach, P. C., Nashville, for plaintiff-appellant.

Susan Emery McGannon, Bartholomew, Cleary, Stokes & Mudter, Nashville, for defendant-appellee.

## OPINION

LEWIS, Judge.

Plaintiff sued defendant City of Clarksville (City) and alleged that he owned and operated an auto salvage business in the City of Clarksville; that the City had prosecuted him in the Clarksville City Court for operating his salvage yard in alleged violation of a city ordinance; that he had been found guilty and assessed a fine of $25 and costs, had appealed his conviction to the Circuit Court for Montgomery County and that the appeal was presently pending; and that the ordinance as applied to plaintiff was unconstitutional. Plaintiff prayed that the City be temporarily enjoined from enforcing the ordinance against plaintiff during the pendency of the suit, that after a hearing the City be permanently enjoined from enforcing the ordinance against him, and that Article VIII, Section E of Ordinance 7–1974–75 be declared unconstitutional. The City was temporarily enjoined from enforcing the ordinance as to plaintiff.

Subsequently, the City moved for summary judgment "on the ground that there are no genuine issues as to material facts as shown by the pleadings, interrogatories, and admissions on file . . . ."

Thereafter the Chancellor filed a written opinion and, pursuant to that opinion, an order was entered dissolving the temporary injunction and granting the City's motion for summary judgment.

The pertinent facts are as follows: Plaintiff is the owner and operator of Beech Street Auto Salvage located in Clarksville, Montgomery County, Tennessee. This auto salvage yard has been operated at the same location for some twenty-nine years. Prior to 1964, the salvage yard was located outside the city limits of Clarksville. Until 1964, plaintiff's property was not covered by any zoning ordinance. On July 20, 1964, the Montgomery County Zoning Ordinance was passed and plaintiff's property was zoned partly for residential and partly for commercial use.

On December 3, 1964, the City annexed plaintiff's property and on October 5, 1967, the City passed Zoning Ordinance 6–1967–68 which classified a part of plaintiff's property as residential (R–4) and a portion as commercial (C–2). Article VIII, Section E, of Ordinance 6–1967–68 is as follows:

E. *NONCONFORMING USES OF LAND*:

1. A nonconforming use of land existing at the time of adoption of this Ordinance may be continued for a period of not more than five (5) years therefrom, provided;

   a. Said nonconforming use may not be extended or expanded.

   b. If said nonconforming use or any portion thereof is discontinued for a period of six (6) months, or changed, any future use of the land shall be in conformity with the provisions of the district in which it is located.

2. The following regulations shall apply to any automobile wrecking, junk, or salvage yard, building material storage yard, contractor's yard, sawmill, or any similar more or less temporary use of land when located as a nonconforming use in any residential district.

   Any such use is hereby declared to be a public nuisance in any residential district established by this Ordinance and shall be abated, removed or changed to a conforming use within a period of two (2) years after the effective date of this Ordinance.

3. Any nonconforming automobile wrecking, junk or salvage yard in any *non-residential* district shall be, after the adoption of this Ordinance, abated, removed, or changed to a conforming use within five (5) years.

Plaintiff's use of his property as an auto salvage yard is a nonconforming use under both R–4 and C–2 classifications.

As will be noted, the 1967 Ordinance provides that an automobile salvage yard is a public nuisance if located in a residential district established by the Ordinance and shall be abated, removed or changed to a conforming use within a period of two years after the effective date of the Ordinance. If the automobile salvage yard is located in a non-residential district then it shall be abated, removed or changed to a conforming use within five years.

On November 7, 1974, the City passed Zoning Ordinance 7–1974–75 and repealed Ordinance 6–1967–68.[1]

Notwithstanding the 1967 and 1974 zoning ordinances, plaintiff, until 1978, operated his auto salvage yard without interference by the City. In 1978 the City prosecuted plaintiff in the City Court for Clarksville for allegedly violating Ordinance 7–1974–75.

The first issue raised by plaintiff is: "Did the enforcement of the Clarksville zoning ordinance against plaintiff violate T.C.A. § 13–7–208?"

That portion of T.C.A. § 13–7–208 pertinent to the case at bar became effective in 1973 and provides as follows:

In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions and such zoning restrictions differ from zoning restrictions imposed after the zoning change, then any industrial commercial or business establishment in operation, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted provided that no change in the use of the land is undertaken by such industry or business.

Plaintiff argues that since the zoning ordinance under which he was prosecuted became effective after the foregoing portion of T.C.A. § 13–7–208, the enforcement of Ordinance 7–1974–75 as to him is in violation of T.C.A. § 13–7–208.

Plaintiff correctly contends that to invoke the protection of T.C.A. § 13–7–208 insofar as he is concerned, two requirements must be met: "(1) There must be zoning where there previously was none, or there must be a change in zoning restrictions, and (2) there must be permissive operation of a business prior to the change."

Plaintiff says the zoning restrictions were changed as follows:

(1) The permitted uses for the C–1 portion of plaintiff's property were changed in that Article IV, Section 8B of the prior ordinance allowed any use permitted in a C–1 neighborhood commercial district, but the new ordinance excluded this provision. Also, in Article IV, Section 8B, the prior ordinance allowed commercial recreational structures and uses, such as theaters, bowling alleys, and poolrooms, but the new ordinance prohibited drive-in theaters, bowling alleys, poolrooms, par-three golf courses, practice golf driving ranges, or similar uses.

(2) Article 7–30–37 of the new ordinance, entitled "AUTOMOBILE WRECKING AND JUNK YARDS," changed the requirements for the operation of plaintiff's business by requiring the licensing of the business by the Board of Zoning Appeals and the removal of any wrecked vehicles that could be seen from a public right-of-way to a licensed junk yard within two (2) years from the effective date of the ordinance. It further required that plans be submitted to

1. Ordinance 7–1974–75, Article IX, Section 30–58.

the City for approval of the operation of plaintiff's business.

(3) Article VIII, Section E, of the new ordinance changed the number of years from five (5) to two (2) in which a nonconforming use located on non-residential property had to cease.

Under both the 1967 and 1974 Ordinances plaintiff's property was divided into two separate zoning classifications, residential and commercial. The commercial portion of plaintiff's property was zoned C–2. The 1967 Ordinance permitted certain specified uses of C–2 property and "any use permitted in a C–1 neighborhood commercial district." The 1974 Ordinance omitted the language which automatically included a C–1 use. From an examination of this record we find that this is not a significant change insofar as plaintiff is concerned. None of the C–1 uses have any relationship whatsoever to the plaintiff's use of his property and, therefore, their omission from the 1974 Ordinance is immaterial.

As to plaintiff, the prohibition of drive-in theaters, bowling alleys, poolrooms, etc. is not a material change. The actual and proposed use for plaintiff's property had nothing to do with drive-in theaters, bowling alleys, poolrooms, etc.

■ Plaintiff's contention that there was a change in the zoning restrictions by reducing from five to two years the period for continuation of a nonconforming use is as applied to him, without merit. Plaintiff's business is conducted on both residentially zoned and non-residentially zoned areas. The 1967 Ordinance provided for a two-year period of abatement in residential areas and this provision was unchanged by the 1974 Ordinance.

The reduction from five to two years for non-residential property did not effect any change in the status of plaintiff's land.

The 1967 Ordinance provided for a two-year period for abatement for an auto salvage yard on residential property and five years on non-residential property. Plaintiff admits that the use of his property was a nonconforming use on both residential and non-residential property in 1967. Plaintiff's use of that portion of the property zoned residential became, under the 1967 Ordinance, illegal in 1969 when the two-year period for abatement expired. The five-year period for abatement on non-residential property expired in 1972. Under the Ordinance, plaintiff's use of his property was illegal on May 13, 1973, the effective date of T.C.A. § 13–7–208. There was no change in the status of the zoning applicable to plaintiff after passage of T.C.A. § 13–7–208.

■ Plaintiff also contends that he was permitted to operate his auto salvage yard prior to the change in the zoning restriction. He insists that since the City did not enforce the 1967 zoning Ordinance insofar as he was concerned, he was permitted to operate within the meaning of T.C.A. § 13–7–208. This contention is without merit. The 1967 Ordinance did not "permit" plaintiff to operate. It specifically stated that the use to which plaintiff was putting his property must by abated, removed or changed to a conforming use. T.C.A. § 13–7–208 is plain and refers to a business being permitted to operate "under zoning regulations." Plaintiff's argument, that since the City did not enforce the zoning ordinance it permitted him to operate, is without merit. The clear meaning of T.C.A. § 13–7–208 is that the use must be permitted by the zoning regulations, not permitted through lax enforcement. The failure of the City to enforce the ordinance for a period of time does not estop the City from enforcing it eventually. *Lee v. Seitz,* 13 Tenn.App. 260 (1930). Plaintiff's first issue is without merit.

Plaintiff's second issue is: "Does the use of amortization techniques to force zoning changes upon pre-existing lawful uses of land violate the Constitutions of the United States and Tennessee?"

Plaintiff does not question the constitutionality of the entire zoning ordinance but only Article VIII, Section E, of Ordinance 7–1974–75 which constitutes an "amortization" technique for eliminating pre-existing lawful nonconforming uses. Plaintiff says this amortization technique violates the

Fourteenth Amendment to the United States Constitution and Article 1, Section 8, of the Constitution of Tennessee. Plaintiff insists that this section of the Ordinance, insofar as he is concerned, violates these constitutional provisions because its enforcement against him constitutes an arbitrary interference by the City with a reasonable enjoyment of private land and is a taking of private property without due process of law.

That municipalities of Tennessee have the power to restrict the use of property by means of zoning regulations has been clearly established. *Spencer-Sturla Co. v. City of Memphis*, 155 Tenn. 70, 290 S.W. 608 (1927). There the court upheld the constitutionality of a zoning ordinance of the City of Memphis, which was attacked under Article 1, Section 8, of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. The court held that a zoning ordinance restricting the use to which land located within a particular zoning district could be put was a valid exercise of the police power conferred upon a municipal corporation by enabling state legislation. The Court stated as follows:

> [I]t may be said safely that the legislature may impose any limitation upon the use of property which it may deem necessary or expedient to promote and protect the safety, health, morals, comfort and welfare of the people, provided only that this power shall not be exercised arbitrarily; that is, without reasonable connection or relation between the limitation imposed and the public safety, health or welfare, etc.

155 Tenn. at 83, 290 S.W. at 612.

However, our research fails to disclose, and the parties have cited, no cases wherein the constitutionality of the use of "amortization" in zoning restrictions has been passed upon in Tennessee.

Zoning laws originally sought to control the future development of land by forbidding the institution of land use inconsistent with the zoning plan and the expansion of nonconforming uses already in existence. "It was felt . . . that the well-ordered community could be achieved by control of new land uses only, and that orderly city development would not be materially disrupted by existing uses inconsistent with the zones in which situated." Comment, *The Abatement of Pre-existing Nonconforming Uses Under Zoning Laws: Amortization*, 57 Nw. U.L.Rev. 323 (1962) (hereafter cited as 57 Nw.U.L.Rev.). It was thought that these nonconforming uses would finally disappear of their own accord and that it would therefore be unnecessary to specifically prohibit them. Bartholomew, *The Zoning of Illinois Municipalities*, 17 *Ill. Municipal Rev.* 221 (1938).

However, pre-existing nonconforming uses have not faded away but have tended to prosper under the monopolies given them by the zoning laws. As the highest court of Maryland has stated, "[t]here is general agreement that the fundamental problem facing zoning is the inability to eliminate the nonconforming use." *Grant v. Mayor and City Council of Baltimore*, 212 Md. 301, 308, 129 A.2d 363, 365 (1957).

Some courts have developed theories under which the zoning laws can compel the abatement of nonconforming uses.

In a number of instances, zoning authorities, with the design of eliminating nonconforming uses and at the same time respecting an owner's property rights, have provided for the "amortization" of nonconforming uses by requiring the termination of such uses within, or at the expiration of, a specified period of time. Generally speaking, the courts have taken one of two basic views on the validity of these amortization provisions. The preponderance of decisions supports the proposition that provisions for the amortization of nonconforming uses are valid if reasonable.

82 Am.Jur.2d *Zoning & Planning* § 188 (1976).

> The fundamental question in this process is whether an existing land use is, with regard to due process, legally distinct from a contemplated use, so that, although a contemplated use may be validly prohibited, an existing use must be

allowed to continue. If there is no such constitutional distinction, then the way is clear for the development of a theory, such as amortization, on which pre-existing nonconforming uses may be eliminated.

57 Nw.U.L.Rev. 323–24.

One effect of any zoning ordinance, whether it be prospective or retrospective, is to curtail the rights of the individual property owner and deprive him of a part of the value which his property would have if its use were unrestricted. In considering the constitutionality of prospective zoning ordinances, some courts have subordinated these rights to the well being of the community as a whole and have upheld their deprivation. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Other courts have created a distinction between prospective and retrospective zoning and where the effect of an ordinance has been to require termination of an existing use, the owner's interests have been held to be in the nature of a "vested right" which may not constitutionally be denied. *McCaslin v. City of Monterey Park*, 163 Cal.App.2d 339, 329 P.2d 522 (1958).

Under the "vested rights" principle, a situation may be created where the use of the property by the owner who stands to lose little is immune while the proposed use by an owner who stands to lose much may be proscribed without regard to the relative damages done by the two uses to the zoning plan.

The vested right of a property owner in an existing use has not prevented municipal authorities from forbidding the expansion or replacement of the physical appurtenances of the use, nor from imposing retroactive building regulations which compel the landowner to make alterations in his property in order to bring it into conformity with fire or safety codes. *See generally* Anderson, *The Nonconforming Use—A Product of Euclidian Zoning*, 10 Syracuse L.Rev. 214 (1959).

While the constitutionality of ordinances prohibiting future land use was originally based upon an analogy to the law of nuisance (*see Village of Euclid v. Ambler Realty Co., supra*), in the past few years the legal basis of zoning has been expanded to forbid more comprehensive growth control to meet what had been felt to be the needs of increasingly congested urban areas. Courts have laid stress upon the "general welfare" aspect of the police power rather than the "health and safety" aspects from which the nuisance basis for zoning was drawn and have sustained the use of zoning power for the control of land use which would have had merely intangible deleterious effects upon the surrounding areas. *Pierro v. Baxendale*, 20 N.J. 17, 118 A.2d 401 (1955). In *Pierro*, the Court stated:

[A]lthough earlier cases had confined zoning to such regulations as were needful for the public health, safety and morals, later cases [have] recognized regulations requisite for "public convenience" and "general prosperity" as promoting the general welfare.

*Id.* at 28, 118 A.2d at 407.

The whole basis of police power infringements upon property rights has been a weighing of benefits to the community against the loss suffered by the property owner.

Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation to sustain the act.

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

█ A zoning ordinance that restricts a future use and one that requires existing uses to stop after a reasonable time is not a

difference in kind, but one of degree, constitutionally depending in each case on overall reasonableness, i. e., the importance of the public gain in relation to the private loss. *Grant v. Mayor and City Council of Baltimore, supra.*

■ The elimination of nonconforming uses is constitutional if reasonably provided for and if effectuated without producing too great a hardship on the property owner. *Matter of Harbison v. City of Buffalo,* 4 N.Y.2d 553, 176 N.Y.S.2d 598, 152 N.E.2d 42 (1958). "Decisions approving the termination of nonconforming uses after a definite period of time are substantial." (Citations omitted.) *Lachapelle v. Town of Goffstown,* 107 N.H. 485, 488, 225 A.2d 624, 626 (1967). The Court, in *Lachapelle,* cited from *McKinney v. Riley,* 105 N.H. 249, 253, 197 A.2d 218, 222 (1964), the following:

> The validity of provisions requiring the termination of nonconforming uses within a specified period of time has been upheld as a proper exercise of the police power, provided at least that on balance, the public benefit outweighs the private injury, and the time allowed is reasonable.

107 N.H. at 488, 225 A.2d at 626. Further, the Court, after citing cases in which the abatement of nonconforming uses was held unconstitutional, stated:

> We believe that the rigid approach taken by theses cases has a debilitating effect on effective zoning, unnecessarily restricts the police power and prevents the operation of a reasonable and flexible method of eliminating nonconforming uses in the public interest. It is impossible to treat this problem in the abstract or to apply the same time limitation to all nonconforming uses. However, this should not prevent reasonable attempts to discourage the continuation of nonconforming uses in the process of furthering an important public need without confiscatory damage to the landowner.

*Id.* at 488–89, 225 A.2d at 627.

■ This Court finds no legal distinction between prospective and retrospective zoning. "Amortization" to eliminate noncon- forming uses does not violate either the Fourteenth Amendment to the United States Constitution or Article 1, Section 8, of the Constitution of Tennessee. However, when requiring the termination of a nonconforming use within a specified period of time as a proper exercise of police power, the public benefit must outweigh the private injury: i. e., not only must the ordinance requiring the termination of a nonconforming use be reasonable in and of itself, it must also be reasonable as it applies to the particular property owner.

In those jurisdictions in which the rule of reasonableness has prevailed, certain factors have been stated to have special significance in determining whether an amortization provision is reasonable. Generally speaking, the courts have considered any circumstances bearing upon a balancing of the public gain against the private loss, with some courts laying particular emphasis on the length of the amortization period in relation to the investment, and with some courts placing particular importance on the relationship between the length of the amortization period and the nature of the nonconforming use. On the public benefit side of the scale, the degree of offensiveness of the nonconforming use, in view of the character of the surrounding neighborhood, has often been significant.

82 Am.Jur.2d *Zoning & Planning* § 189 (1976).

In determining if zoning to terminate a particular nonconforming use is reasonable, each case must be judged upon its particular facts with due consideration given to the interest of the public and the individual property owner.

■ Plaintiff's last issue is: "Did the Chancellor commit error in granting summary judgment for the defendant?" We, after a review of this record, are of the opinion that the Chancellor erred in sustaining the motion for summary judgment.

The Chancellor, in upholding the City's right to "set a time limit for which a nonconforming use may continue," stated:

This Court accepts the City of Clarksville's right to cut off a person's use of property if designated as a nonconforming use at some given period of time if that given period of time is a reasonable one. The general rationale of the Courts of this land in regard to the time limit on the use of a nonconformity is the reasonableness.

 While time is a paramount factor to be taken into consideration in determining the validity of zoning to terminate a nonconforming use, it is not the only factor. It could hardly be said that a zoning ordinance in a metropolitan area declaring any building in excess of five stories to be a nonconforming use and setting a thirty-year "amortization" period would be a reasonable zoning ordinance in this day and age. While the time period might well be reasonable, since the building could be fully depreciated within the time limit, absent more, the simple designation of all buildings over five stories as a nonconforming use by the zoning body would certainly be unreasonable.

We are of the opinion that this case should be remanded to the Chancery Court. On remand, the Chancellor should first determine whether the zoning ordinance is facially reasonable. If the Chancellor finds the ordinance to be reasonable, he should then determine after an evidentiary hearing if the ordinance is reasonable as applied to plaintiff. In determining if the ordinance is reasonable as applied to plaintiff, the following, while not all inclusive, should be taken into consideration: 1) the structure located on the property; 2) the use of the property; 3) the location of the property; 4) the cost of the property; 5) the benefit to be derived by the public; 6) the period of use; and 7) the amortization period. In determining whether the amortization period is reasonable, consideration should be given to the length of the amortization period in relation to the property owner's investment and the length of the amortization period in relation to the use of the property.

It should also be remembered that retrospective zoning is only one of several possible methods of attempting to eliminate nonconforming uses. There are other methods which include condemnation through the power of eminent domain, invoking the law of nuisance, forbidding a resumption of use after a specified period of nonuse, and prohibiting or limiting extensions or repairs to property.

Plaintiff's issues one and two are without merit. Issue three is sustained and the judgment of the Chancellor is reversed and the cause remanded to the Chancery Court for further proceedings not inconsistent with this opinion. Costs are taxed to the City.

CANTRELL and CONNER, JJ., concur.